UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

NATHANIEL J. BUCKLEY,

Plaintiff,

v.

U.S. DEPARTMENT OF JUSTICE,

Defendant.

---

DECISION
and
ORDER

19-CV-319F
(consent)

APPEARANCES: MICHAEL KUZMA, ESQ.
Attorney for Plaintiff
1893 Clinton Street
Buffalo, New York 14206

TRINI E. ROSS
UNITED STATE ATTORNEY
Attorney for Defendant
MICHAEL S. CERRONE
Assistant United States Attorney, of Counsel
Federal Centre
138 Delaware Avenue
Buffalo, New York 14202

**JURISDICTION**

On August 16, 2019, the parties to this action consented pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned. The matter is presently before the court on motions for summary judgment filed by Defendant on December 20, 2019 (Dkt. 13), and by Plaintiff on March 5, 2020 (Dkt. 19).

**BACKGROUND**

Plaintiff Nathaniel J. Buckley ("Plaintiff" or "Buckley"), commenced this action pursuant to the Freedom of Information Act ("FOIA" or "the Act"), 5 U.S.C. § 552 *et seq.*,

on March 8, 2019, seeking an injunction and other relief, including the disclosure and release of agency records withheld by Defendant United States Department of Justice ("Defendant" or "DOJ") in response to Plaintiff's requests for information pertaining to a two-year investigation by the Federal Bureau of Investigation ("FBI") of Plaintiff and Leslie James Pickering ("Pickering"), and their possible involvement in domestic terrorism and an eco-terrorism[1] conspiracy. On December 20, 2019, Defendant filed a motion for summary judgment (Dkt. 13) ("Defendant's Motion"), a Memorandum of Law (Dkt. 14) ("Defendant's Memorandum"), the Declaration of David M. Hardy (Dkt. 15) ("Hardy Declaration"), attaching exhibits A through L (Dkt. 15-1) ("Defendant's Exh(s). __"), and a Statement of Undisputed Facts (Dkt. 16) ("Defendant's Statement of Facts"). Also filed as Defendant's Exh. L (Dkt. 15-1 at 51-56), is the so-called "*Vaughn* Index" the requested government agency is required to furnish in responding to a FOIA request for records, purporting to identify each piece of information responsive to a FOIA request, as well as whether each responsive piece was released in full ("RIF"), released in part ("RIP"), or withheld in full ("WIF"), and the asserted reason why any information was withheld either in full or in part.[2] On March 5, 2020, Plaintiff filed a motion for summary judgment (Dkt. 19) ("Plaintiff's Motion"), the Memorandum of Law in Support of Motion for Summary Judgment (Dkt. 20) ("Plaintiff's Memorandum"), the Affidavit of

---

[1] A precise definition of "eco-terrorism" is not provided in the record. Although Plaintiff asserts he was investigated for both domestic terrorism and eco-terrorism, the parties essentially refer only to domestic terrorism and the court, in the interest of simplicity, does likewise.

[2] The "*Vaughn* Index" refers to an index prepared by the agency upon whom a FOIA request is made setting forth all materials otherwise responsive to the FOIA request but which the agency withholds as exempt as well as the exemptions asserted as justifying the withholdings. *See Vaughn v. Rosen*, 484 F.2d 820, 826-27 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 977 (1974) (requiring government agency, in responding to FOIA request, prepare a list of documents withheld as exempt, either in full or in part, and furnish detailed justification for the asserted exemptions).

Nathaniel J. Buckley (Dkt. 21) ("Plaintiff's Affidavit"), attaching exhibits 1 through 5 (Dkts. 21-1 through 21-5) ("Plaintiff's Exh(s). __"), and Plaintiff's Statement of Material, Undisputed Facts and Response to the FBI's Statement of Undisputed Facts Pursuant to Local Rule 56 (Dkt. 22) ("Plaintiff's Statement of Facts"). In further support of Defendant's Motion, Defendant filed on August 28, 2020, the Reply Memorandum of Law (Dkt. 28) ("Defendant's Reply"), and the Declaration of Michael G. Seidel (Dkt. 29) ("Seidel Declaration"). Oral argument was deemed unnecessary.

Based on the following, Defendant's Motion should be GRANTED; Plaintiff's Motion should be DENIED.

## **FACTS**[3]

Plaintiff and Pickering are co-owners of Burning Books ("Burning Books"), an independent book store located in Buffalo, New York ("Buffalo"), which Plaintiff describes as "specializing in social justice struggles and state repression." Plaintiff's Affidavit ¶ 2. Burning Books has hosted events featuring political activists and journalists, and screenings of film documentaries on such topics as civil rights and environmental concerns, which events were monitored by undercover FBI agents and informants. Plaintiff is an associate of Friends of the Ancient Forest, and has participated in protests to prevent logging in Zoar Valley, a deep canyon river valley located between Cattaraugus and Erie Counties in western New York, and in "ARISSA," a community activist organization on Buffalo's west side.[4] In 2011, Plaintiff was

[3] Taken from the pleadings and motion papers filed in this action.
[4] The record does not reveal whether "ARISSA" is an acronym and, if so, what each letter represents.

criminally prosecuted in Buffalo City Court for participating in an anti-war protest,[5] with stories about Plaintiff's arrest and subsequent trial featured in local news media outlets including The Buffalo News, a local newspaper of general circulation, radio station WBFO, and television news station WIVB. Commencing in January 2012 and continuing through January 2014, Plaintiff was the subject of a federal ecoterrorism conspiracy investigation based on Plaintiff's association with Pickering. In connection with this investigation, Plaintiff sought to obtain from the FBI copies of all records pertaining to Plaintiff and that are the subject of the instant action. Plaintiff suspects that some of the information that may be present in the FBI's records would pertain to statements made by Amy Upham ("Upham") and Selena K. Lloyd ("Lloyd"), both of whom were tenants in the apartment located above Burning Books from April 2011 through November 2011, and neither of whom personally liked Plaintiff or Pickering. Plaintiff further maintains that Lloyd's animus toward Plaintiff was so great that Crisis Services, Inc. ("Crisis Services"), warned Plaintiff that Lloyd, upon being released from Erie County Medical Center's Mental Health Unit, made death threats against Plaintiff.

With regard to Plaintiff's attempts to obtain the information from the FBI, by letter dated February 9, 2016 ("FOIA Request"),[6] Plaintiff, through his legal counsel, Michael Kuzma, Esq. ("Kuzma"), requested

> any and all records that were prepared, received, transmitted, collected, and/or maintained by the Federal Bureau of Investigation (FBI), the Terrorist Screening Center, the National Joint Terrorism Task Force, or any Joint Terrorism Task Force relating or referring to *Nathaniel J. Buckley*.

FOIA Request at 1 (italics in original).

---

[5] The charges eventually were dismissed with prejudice. *People v. Buckley*, 967 N.Y.S.2d 868 (City Ct. 2013)

[6] Defendant's Exh. A (Dkt. 15-1 at 1-5).

The FOIA Request was accompanied by the required DOJ Certificate of Identity, Form DOJ-361 ("Certificate of Identity forms"), completed with Plaintiff's information and signature. FOIA Request at 5. By letter dated February 23, 2016 ("February 23, 2016 Letter"),[7] the FBI acknowledged receipt of the FOIA Request, assigning it Freedom of Information/Privacy Acts ("FOIPA") Request Number 1344909-000 ("First FOIPA"). By letter to the DOJ dated February 6, 2017 ("February 6, 2017 Letter"),[8] Plaintiff advised Defendant had failed to provide records responsive to the First FOIPA within 20 days of receiving the FOIA Request, and that Plaintiff was treating the DOJ's failure to timely respond as a denial of the FOIA Request. By letter dated February 21, 2017 ("February 21, 2017 Letter"),[9] the DOJ acknowledged receipt of the February 6, 2017 Letter and advised it was being considered an appeal, assigning it number DOJ-AP-2017-002444 ("First Appeal"). By letter dated March 21, 2017 ("March 21, 2017 Letter"),[10] the DOJ's Office of Information Policy ("OIP"), advised Kuzma that the First Appeal was without merit because it was filed prior to any adverse opinion being made regarding Plaintiff's FOIA Request, but that the OIP had contacted the FBI and the FOIA Request was being processed.

On November 20, 2017, the FBI released records responsive to Plaintiff's FOIA Request ("First Records Release"),[11] advising 16 records were located and reviewed, with 14 of the records released in full or in part, explaining the withheld records were protected from disclosure pursuant to FOIA Exemptions 3, 6, 7(c), 7(D), and 7(E),[12] but

---

7 Defendant's Exh. B (Dkt. 15-1 at 6-8).
8 Defendant's Exh. C (Dkt. 15-1 at 9-10).
9 Defendant's Exh. D (Dkt. 15-1 at 11-12).
10 Defendant's Exh. E (Dkt. 15-1 at 13-14).
11 Defendant's Exh. F (Dkt. 15-1 at 15-18).
12 The categories of government records exempt from disclosure under FOIA are set forth in 5 U.S.C. § 552(b).

that Plaintiff could appeal the FBI's decision by filing an administrative appeal with the DOJ's OIP within 90 days or by seeking dispute resolution through the Office of Government Information Services ("OGIS") or the FBI's FOIA Public Liaison. By letter dated February 6, 2018 ("Second Appeal"),[13] Plaintiff appealed to OIP for assistance with the FBI's alleged inadequate search and failure to reasonably segregate portions of the First Records Release. Included with the appeal were additional completed Certification of Identity forms authorizing the release to Kuzma of any information responsive to Plaintiff's FOIA Request pertaining to John Buckley, Sarah Buckley, Daire Brian Irwin, Carrie Ann Nader, Leslie James Pickering, Theresa Baker-Pickering, Sean Francis Raess, and Michael Kuzma. *See* Dkt. 15-1 at 22-29. On February 20, 2018, the OIP acknowledged receipt of the Second Appeal which was assigned number DOJ-AP-208-00286.[14]

By letter dated August 9, 2018 ("August 9, 2018 Letter"),[15] DOJ OIP advised Plaintiff of the FBI's actions on Plaintiff's FOIA Request, *i.e.*, the documents, with some redactions, included in the First Records Release, were affirmed, and that the FBI properly withheld certain information as protected from disclosure pursuant to FOIA exemptions. The OIP also confirmed the FBI conducted an adequate and reasonable search for records responsive to Plaintiff's FOIA Request, advising if Plaintiff remained dissatisfied with the OIP's action on Plaintiff's Second Appeal, Plaintiff could commence an action in federal district court pursuant to 5 U.S.C. § 552(a)(4)(B). Accordingly, on March 8, 2019, Plaintiff commenced the instant action.

[13] Defendant's Exh. G (Dkt. 15-1 at 19-21).
[14] Defendant's Exh. H (Dkt. 15-1 at 30-31).
[15] Defendant's Exh. I (Dkt. 15-1 at 32-35).

On June 12, 2019, in response to a request from the FBI, Plaintiff provided newly completed and signed DOJ-361 forms authorizing the release to Plaintiff of information pertaining to John Buckley, Sarah Buckley, Daire Brian Irwin, Carrie Ann Nader, Leslie James Pickering, Theresa Baker-Pickering, Sean Francis Raess, and Michael Kuzma.[16] By letter to Kuzma dated July 12, 2019 ("Second Records Release"),[17] the FBI advised it located and reviewed 58 pages of records responsive to Plaintiff's FOIA Request, releasing 54 pages in full or in part, with certain information withheld pursuant to FOIA exemptions 3, 6, 7(C), 7(D), and 7(E).

In connection with the pending motions, explanations as to how Plaintiff's FOIA Request was processed are provided by David M. Hardy ("Hardy"), and Michael G. Seidel ("Seidel"). Hardy was the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), in Winchester, Virginia, when the search for records responsive to Plaintiff's FOIA Request occurred. Hardy Declaration ¶ 1. Hardy was succeeded by Seidel who was Assistant Section Chief of RIDS when the relevant records search occurred, becoming Acting Section Chief May 26, 2020 until July 26, 2020, when Seidel became Section Chief of RIDS, IMD, FBI. Seidel Declaration ¶ 1.

According to Hardy, in fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency, the FBI compiles and maintains in the Central Records System ("CRS") records consisting of applicants, investigative, intelligence, personnel, administrative, and general files. The CRS maintains records

---

[16] Defendant's Exh. J (Dkt. 15-1 at 36-45).
[17] Defendant's Exh. K (Dkt. 15-1 at 46-50).

for the entire FBI organization including FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attached Officers ("Legats") worldwide.

CRS files are numerically sequenced and organized according to designated subject categories referred to as "FBI classifications." As each FBI case file is opened, the file is assigned a Universal Case File Number ("UCFN") consisting of three sequential components including (1) the CRS file classification number; (2) the abbreviation of the FBI Office of Origin ("OO") initiating the file; and (3) the assigned individual case file number for that particular subject matter. Within each case file, certain documents of interest are "serialized" *i.e.*, assigned a document number in the order in which the document is added to the file, typically in chronological order.

Records are located within the CRS through its general indices with the files alphabetized according to subject matters including individuals, organizations, events and subjects of investigative interest. Entries in the general indices fall into two categories including (1) a main entry created for each individual or non-individual that is the subject or focus of an investigation, and (2) a reference or "cross-reference" entry created for individuals or non-individuals associated with a case, but not the main subject or focus of an investigation. Reference subjects typically are not identified in the case title of a file. CRS indexing information is done by FBI investigators who have the discretion to deem information sufficiently significant to warrant indexing for future retrieval. Thus, not every individual name, organization, event, or other subject matter is separately indexed in the general indices.

In 1995, Automatic Case Support ("ACS"), an electronic, integrated case management system was implemented with CRS records converted from automated

systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices. ACS searches were conducted through use of the Universal Index ("UNI") which provides an electronic means to search by indexing pertinent investigative information including such identifying information as name, date of birth, race, sex, locality, Social Security Number, address, and date of an event. On July 1, 2012, the Sentinel system ("Sentinel") became the effective FBI-wide case management system. Sentinel includes the same automated applications utilized in ACS, and also provides a web-based interface to FBI users. Sentinel did not replace ACS, however, until August 1, 2018, when ACS data was migrated into Sentinel including ACS indices data and digitalized investigative records. Sentinel also retains the index search methodology and function whereby the CRS is queried via Sentinel for pertinent indexed main or reference entries in case files. As such, CRS index data from the UNI application previously searched via ACS is now searched within Sentinel using the "ACS Search" function.

Accordingly, upon receiving FOIPA requests for information on subject matters predating implementation of Sentinel, RIDS begins its searching efforts by conducting index searches via Sentinel's ACS Search function, followed by an index search of Sentinel records to ensure any subsequent records or data relevant to the FOIPA request are located. The CRS automated indices are updated daily with searchable material newly indexed in Sentinel.

Each page of the records responsive to Plaintiff's FOIA Request is Bates-stamped. Defendant provides a "*Vaughn* Index"[18] listing a description of each

[18] Defendant's Exh. L (Dkt. 15-1 at 51-56).

document with the associated Bates-stamped page number, and a chart indicating for each record whether it was released in full, released in part, or withheld in full, as well as on which FOIA Exemption Defendant relies to support withholding the information. The *Vaughn* Index shows Defendant identified 58 records responsive to Plaintiff's FOIA Request, of which three were RIF, 51 were WIP, and 4 were WIF. The 58 records appear in 23 separately "serialized" documents ("serials"), *i.e.*, documents arranged in chronological order.

## DISCUSSION

### 1. Summary Judgment

Both Plaintiff and Defendant move for summary judgment on Plaintiff's challenges to the adequacy of the documents provided in response to Plaintiff's FOIA Request in the First and Second Records Releases. Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). The court is required to construe the evidence in the light most favorable to the non-moving party, *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011), and summary judgment may not be granted based on a credibility assessment. *See Reyes v. Lincoln Automotive Financial Services*, 861 F.3d 51, 55 (2d Cir. 2017) ("Adverse parties commonly advance conflicting versions of the events throughout a course of litigation. In such instances on summary judgment,

the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." (citations, quotation marks, and brackets omitted)). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). "A fact is material if it 'might affect the outcome of the suit under governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)). A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)). Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes*

*Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

In the instant case, Defendant argues in support of summary judgment the FBI's search of records responsive to the FOIA Request was adequate, Defendant's Memorandum at 6-8, Plaintiff has no right to the requested records that are within the purview of the Privacy Act, *id*. at 8-10, and the FBI's FOIA Request response was proper because it complied with segregability requirements, *id*. at 10-11, as well as with the asserted FOIA exemptions, *id*. at 12-18. In response to Defendant's Motion and in support of Plaintiff's Motion, Plaintiff argues the FBI's investigations of Plaintiff do not qualify for FOIA's law enforcement exception, Plaintiff's Memorandum at 1-3, requests the court order the FBI release the non-exempt portions of the records, *id*. at 3-4, maintains the FBI's search for records was inadequate, *id*. at 4-5, asserts the FBI improperly withheld information based on the various FOIA exemptions, *id*. at 5-12, and requests an award of attorney fees and costs incurred in connection with this action. *Id*. at 12. In reply, Defendant argues the FBI's search for records responsive to Plaintiff's FOIA Request was adequate, Defendant's Reply at 2-5, and the FBI's response to the FOIA Request was proper with regard to segregability, *id*. at 5-7, as well as with regard to information withheld pursuant to the various asserted FOIA exemptions, *id*. at 7-19,

and maintains not only is Plaintiff's argument in support of attorney fees an argument that is premature on summary judgment, *id*. at 20, but that even if such request were ripe for determination, the circumstances of the instant action do not support such an award. *Id*. at 20-23.

**2. FOIA Overview**

"The Freedom of Information Act adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." *Halpern v. F.B.I.*, 181 F.3d 279, 286 (2d Cir. 1999) (citing cases). "As noted by the Supreme Court, under FOIA, 'federal jurisdiction is dependent on a showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records.''" *Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1980) (quoting *Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 150 (1980))). "Only when each of these criteria is met may a district court 'force an agency to comply with the FOIA's disclosure requirements.'" *Id*.

"[T]he strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *U.S. Dep't of State v. Ray,* 502 U.S. 164, 173 (1991). The agency has the initial burden to show it conducted an adequate search for responsive records. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir.), *cert. denied*, 513 U.S. 823 (1994). A search is considered adequate if it was reasonably calculated to uncover all relevant documents, yet reasonableness does not demand perfection, and a reasonable search need not uncover every document extant. *Grand Cent. Partnership, Inc.,* 166 F.3d at 489.

"The FOIA requires that agency records be made available promptly upon a request that 'reasonably describes such records and ... is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed.'" *Ruotolo v. Dep't of Justice, Tax Division*, 53 F.3d 4, 9 (2d Cir. 1995) (quoting 5 U.S.C. § 552(a)(3)). FOIA, however, exempts from disclosure nine categories of information. 5 U.S.C. § 552(b)(1) through (9) ("Exemption (b)(__)"). "Accordingly, to prevail on a summary judgment motion in a FOIA case, an agency must demonstrate 'that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements.'" *Ruotolo*, 53 F.3d at 9 (quoting *Nat'l Cable Television Ass'n Inc. v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)). Furthermore, "'to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate.'" *Id.* (quoting *Carney*, 19 F.3d at 812).

"'Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face.'" *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 398 (S.D.N.Y. 2014) (quoting *Carney,* 19 F.3d at 812 (citation omitted)). "'In order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate.'" *Id.* (citations omitted).

"Summary judgment is the preferred procedural vehicle for resolving FOIA disputes." *Bloomberg, L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649 F.Supp.2d 262, 271 (S.D.N.Y. 2009). "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney*, 19 F.3d at 812. In contrast, "'[s]ummary judgment in favor of [a] FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption.'" *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 36 F.Supp.3d 384, 398 (S.D.N.Y. 2014) (quoting *NY. Times Co. v. U.S. Dep't of Def.*, 499 F.Supp.2d 501, 509 (S.D.N.Y. 2007)). In resolving a summary judgment motion in a FOIA action, the district court conducts a *de novo* review of an agency's response to a FOIA request including any government records which the agency claims are exempt from disclosing. *See Lee v. F.D.I.C.*, 923 F.Supp. 451, 453 (S.D.N.Y. 1996) (citing 5 U.S.C. § 552(a)(4)(B); *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361-62 (1976). Such "*de novo* review requires the court to reweigh the evidence compiled by the agency to determine whether the agency's findings are correct, not just whether they are reasonable." *Id*. at 453-54. Although FOIA authorizes *in camera* inspection of the documents in question, it is not required. *Id*. (citing 5 U.S.C. § 552(a)(4)(B)).

**3. FBI FOIA Request**

As stated, Plaintiff's challenge to the information released by the FBI in response to Plaintiff's FOIA Request includes that the FBI improperly withheld information pertaining to an investigation of Plaintiff for exercising his First Amendment rights,

Plaintiff's Memorandum at 2-3, requests the court order the FBI release non-exempt portions of the requested records the FBI erroneously maintains are "inextricably intertwined" with exempt portions, *id*. at 3-4, the FBI's records search was inadequate, *id*. at 4-5, and the FBI improperly withheld information based on various FOIA exemptions. *Id*. at 5-11. The court addresses each of these argument in turn.

**A. Propriety of Investigation**

At the outset, Plaintiff argues that the Privacy Act of 1974, 5 U.S.C. § 552a ("the Privacy Act"), specifically forbids any agency from maintaining records describing how any individual exercises First Amendment rights unless, as relevant here, such records are pertinent to or within the scope of authorized law enforcement activity. 5 U.S.C. § 552a(e)(7). Plaintiff's Memorandum at 2. According to Plaintiff, the investigation conducted by the FBI between 2012 and 2014, into Plaintiff and Pickering's possible involvement in domestic terrorism and eco-terrorism based on their activities at Burning Books was illegal because the activities being investigated consisted of guest speakers at events promoting social justice and the environment, as well as exposing the plight of political prisoners, all activities entitled to First Amendment protection. *Id*. As such, for the FBI to invoke FOIA Exemption (b)(7) (exempting from disclosure under FOIA six categories of "records or information compiled for law enforcement purposes) as supporting the withholding of documents responsive to Plaintiff's FOIA Request, the FBI must establish the documents pertain to investigative activities complying with the Privacy Act, *i.e.*, that "were realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached," particularly, as relevant here, involvement in domestic terrorism and eco-terrorism. Plaintiff's

Memorandum at 2 (citing cases). In opposition, Defendant maintains the FBI's investigation of Plaintiff was based on Plaintiff's association with individuals directly involved in domestic terrorism, and thus is supported by 28 U.S.C. §§ 533 and 534, and Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM"), and 28 C.F.R. § 0.85. Defendant's Reply at 10-11 (citing Hardy Declaration ¶ 42, and Seidel Declaration ¶ 7). There is no merit to Plaintiff's argument on this point.

As a threshold matter, Exemption 7 only permits the withholding of records or information to the extent it was "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Accordingly, prior to withholding any records based on any of the six separately enumerated categories in Exemption 7 pertaining to "records or information compiled for law enforcement purposes," 28 U.S.C. § 552(b)(7), the agency must first meet the threshold requirement by demonstrating "the records sought were compiled for law enforcement purposes." *John Doe Agency v. John Doe Corp*., 493 U.S. 146, 148 (1989). Specifically, "[a]n agency must establish a rational nexus between the agency's activity in compiling the documents and its law enforcement duties." *New York Times Co.*, 390 F. Supp. 3d. at 513 (citing *Brennan Ctr.*, 331 F.Supp.3d at 97). Courts broadly construe the terms "law enforcement" and "compiled," with law enforcement purposes consisting of either civil or criminal matters, or an agency's "proactive steps designed to prevent criminal activity and maintain security." *Human Rights Watch v. Dep't of Justice Fed. Bureau of Prisons*, 2015 WL 5459713, at *5 (S.D.N.Y. Sept. 16, 2015) (quoting *Milner v. Dep't of the Navy*, 562 U.S. 562, 582 (2011) (Alito, J., concurring)); *see New York Times Co.*, 390 F. Supp. 3d at 513 (citing *Tax Analysts v. I.R.S.*, 294 F.3d 71, 76

(D.C. Cir. 2002)) (citations omitted). The act of compiling records for law enforcement purposes "requires only 'that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption.'" *Schwartz v. Dep't of Defense*, 2017 WL 78482, at *12 (E.D.N.Y. Jan. 6, 2017) (quoting *Pub. Emps. for Envtl. Responsibility (PEER) v. U.S. Section, Int'l Boundary and Water Comm'n*, 740 F.3d 195, 203 (D.C. Cir. 2014)). This means that a document not originally compiled for a law enforcement purpose may later be "compiled" for purposes of Exemption 7(A). *See John Doe Agency*, 493 U.S. at 154 (reversing Court of Appeals' strict interpretation of "compiled" as meaning "originally compiled"). Further, "[l]aw enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law," *Public Emps. For Env't. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 203 (D.C. Cir. 2014), *i.e.*, statements of an intent to commit a crime, but less than an attempt, and, for purposes of Exemption 7, law enforcement goes beyond traditional investigation and prosecution of individuals for criminal offenses. *See id* (steps taken by law enforcement officers to prevent terrorism are taken for "law enforcement purposes").

Importantly, an agency's statement that records were compiled as a part of an investigation suffices to establish that records were compiled for law enforcement purposes without further factual findings. *Am. Civil Liberties Union Found. v. U.S. Dep't of Justice*, 833 F. Supp. 399, 406 (S.D.N.Y. 1993). Further, "once the government has demonstrated that the records were compiled in the course of an investigation conducted by a law enforcement agency, the purpose or legitimacy of such executive

action are not proper subjects for judicial review." *Halpern v. Fed. Bureau of Investigation*, 181 F.3d 279, 296 (2d Cir. 1999).

Here, Defendant relies on statements by Hardy and Seidel in their respective declarations to support Defendant's assertion that the withheld information was compiled in the course of an FBI investigation. Hardy avers that the records Plaintiff seeks were generated by the FBI "in furtherance of investigations of violations of federal laws to include domestic terrorism and the subject's association with individuals directly involved in such violations." Hardy Declaration ¶ 42. According to Hardy, "records responsive to Plaintiff's request were compiled during the FBI's criminal investigation into other sensitive investigations involving individuals and organizations the subject had an association with." *Id*. Seidel, who succeeded Hardy as Section Chief of RIDS, IMD, FBI, confirms the investigation pursuant to which the responsive records were generated by the FBI "relates to Plaintiff's association with individuals being investigated for Domestic Terrorism activities." Seidel Declaration ¶ 7. In particular, "[t]he 22 serials responsive to Plaintiff's request were all created in connection with Domestic Terrorism investigation activities or other potential illegal activities that could involve violence." *Id*. Accordingly, during the course of the investigation, "[t]he FBI performed various law enforcement duties, to include, but not limited to, surveillance, third-party interviews, handling of source information on potential illegal activity, and various law enforcement database checks, to investigate whether any illegal activity occurred." *Id*.

In the instant case, "a more particularized justification would require reviewing material which the statute specifically exempts from disclosure or information from which inferences of such material can be deduced," and therefore is not required.

*Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 52 (2d Cir. 1985) (citing cases). Moreover, in the instant case, the Plaintiff's own averments in support of summary judgment make clear the records Plaintiff seeks pertain to the FBI's investigation of political activists, including several particular political activities and journalists, as well as a defense attorney known for representing controversial defendants, who have appeared at Burning Books. Plaintiff's Affidavit ¶¶ 2, 13-14. *See Gonzalez v. U.S. Citizenship & Immigr. Servs.*, 475 F.Supp.3d 334, 350-51 (S.D.N.Y. 2020) (finding the plaintiff's own requests for records "make clear that he, in order to establish his claim for asylum in removal proceedings, seeks documents and information concerning the plaintiff's interactions with ICE and HSI" such that any documents responsive to the request would necessarily concern law enforcement activities of the agencies). This sufficiently establishes the records responsive to Plaintiff's FOIA Request were compiled for law enforcement purposes and was used in assisting law enforcement officials in the course of their duties, thereby satisfying the threshold for FOIA Exemption 7. *See Halpern*, 181 F.3d at 296 (no further judicial review is permitted once government establishes records were compiled in the course of a law enforcement investigation); *Am. Civil Liberties Union Found.*, 833 F. Supp. at 406 (agency's statement records compiled as part of investigation establishes records were compiled for law enforcement purposes without further factual findings).

Accordingly, on this argument, summary judgment is DENIED as to Plaintiff and GRANTED as to Defendant.

### B. Segregability

Plaintiff argues the FBI failed to provide "justifications for nondisclosure with reasonably specific details" as required to support withholding four pages of documents in full as well as the release of 54 pages only in part. Plaintiff's Memorandum at 3-4 (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir. 1981)). In opposition, Defendants argues Plaintiff fails to allege how or why the FBI's FOIA release does not comport with the segregability test.[19] Defendant's Reply at 5-7. According to Defendant, the Seidel Declaration sets forth a sufficient explanation of the segregability review conducted on the records responsive to Plaintiff's FOIA Request. *Id*. at 6-7.

Insofar as Plaintiff urges the court to conduct an *in camera* review of the withheld documents "'to look for segregable non-exempt matter,'" Plaintiff's Memorandum at 4 (quoting *Weissman v. Central Intelligence Agenc*y, 565 F.2d 692, 698 (D.C.Cir. 1977)), Congress left it in the court's discretion to determine whether or not to undertake *in camera* review. *Military Audit Project v. Bush,* 418 F.Supp. 876, 879 (D.C.Cir.1976). Moreover, where the Government's affidavits on their face indicate the documents withheld logically fall within the claimed exemptions and there is no doubt as to the requested agency's good faith, the court should restrain its discretion to order *in camera* review. *Lead Industries Ass'n, Inc. v. Occupational Safety and Health Administration,* 610 F.2d 70, 87-88 (2d Cir. 1979). In the instant case, no *in camera* review is required because the Hardy Declaration objectively verifies the FBI's asserted decision to deny

[19] An agency must show that certain material in a document is privileged, but cannot be reasonably segregated from non-exempt material, and must also "describe what proportion of the information is non-exempt and how that material is disbursed throughout the document," such that "both litigants and judges will be better positioned to test the validity of the agency's claim that the non-exempt material is not segregable." *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C.Cir. 1977).

disclosing documents and portions of documents pertaining to investigations of domestic terrorism and environmental extremism.

In particular, Hardy avers the FBI identified 58 pages of responsive records, three which were RIF, four WIF, and 51 RIP. Hardy Declaration ¶ 76. Hardy explains that the redactions to the 51 records RIP, and the four documents WIF avoids otherwise foreseeable harm to one or more of the interests protected by FOIA exemptions. *Id*. Seidel further explains that the redactions and withheld information is supported by the fact that Plaintiff is only referenced throughout the responsive records but, Plaintiff is not the main subject or focus of the domestic terrorism and environmental extremism investigations to which the records pertain. Seidel Declaration ¶ 14. Seidel provides further details as to a three-page document released in part, denominated on the *Vaughn* Index as "FBI document dated November 14, 2003, on information regarding Zoar Valley," and Bates-stamped 27, 28, and 29. Seidel Declaration ¶ 14 (citing *Vaughn* Index, Dkt. 15-1 at 55). Seidel explains that the information withheld on these three pages includes the case file number, database name, and third parties' names and identifying information

"Disclosable information cannot be easily separated from that which is exempt without compromising the secret nature of the information." *Doherty*, 775 F.2d at 52–53. As such, "that there may be some nonexempt matter in documents which are predominantly exempt does not require the district court to undertake the burdensome task of analyzing" withheld documents in camera. *Id*. (citing *Lead Industries,* 610 F.2d at 88. *See also Weissman v. CIA,* 565 F.2d 692, 697–98 (D.C.Cir.1977)). Here, the affidavits submitted provide an objective verification in support of the FBI's decision to

deny disclosure of documents containing intelligence information and material pertaining, as Defendant asserts, to the FBI's investigation of domestic terrorism and environmental extremism. Significantly, Plaintiff concedes the investigations to which his FOIA Request pertains is "a federal eco-terrorism conspiracy investigation based on [Plaintiff's] association with Pickering." Plaintiff's Affidavit ¶ 9.

Summary judgment on Plaintiff's challenge to the segregation of information withheld, either in full or in part, is DENIED as to Plaintiff and GRANTED as to Defendant.

**C. Adequacy of Search**

As to the adequacy of Defendant's search for documents responsive to Plaintiff's FOIA Request, "[t]o secure summary judgment in a FOIA case, the defending agency must show through reasonably detailed affidavits or declarations that it conducted an adequate search and that any withheld documents fall within a FOIA exception." *Adamowicz v. I.R.S.*, 402 Fed.Appx. 648, 650 (2d Cir. 2010) (citing *Carney*, 19 F.3d at 812). *See Hodge v. F.B.I.*, 703 F.3d 575, 579 (D.C. Cir. 2013) ("In general, the adequacy of a search is 'determined not by the fruits of the search, but by the appropriateness of [its] methods.'" (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003))). Such affidavits are accorded "'a presumption of good faith,'" *id*. (quoting *Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009)), "which 'cannot be rebutted by purely speculative claims about the evidence and discoverability of other documents.'" *Id*. (quoting *Grand Cent. P'Ship, Inc.*, 166 F.3d at 489. Significantly, "[a]n affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e); there is no need for the agency to supply affidavits from

each individual who participated in the actual search." *Carney*, 19 F.3d at 814. Nor does the fact that additional records responsive to a FOIA request are not located and produced until after the plaintiff commences a FOIA action render the initial search insufficient. *Hodge*, 703 F.3d at 580 ("it does not matter than an agency's *initial* search failed to uncover certain responsive documents so long as subsequent searches captured them" (italics in original)). Furthermore, "the law demands only a 'relatively detailed and nonconclusory' affidavit or declaration." *Adamowicz*, 402 Fed.Appx. at 650-51 (quoting *Grand Cent. P'Ship, Inc.*, 166 F.3d at 488-89). Here, this standard is satisfied by the Hardy Declaration and the Seidel Declaration provided by Defendant.

Specifically, Hardy avers that when Plaintiff filed his FOIA Request, Hardy, as RIDS Section Chief, was responsible for managing responses to requests for records and information pursuant to, as relevant here, FOIA and the Privacy Act. Hardy Declaration ¶ 2. In such capacity, Hardy is fully familiar with procedures followed by the FBI in responding to FOIA Requests, including the request filed by Plaintiff. *Id*. ¶ 3. Hardy recounts in meticulous detail the steps by which FOIA Requests are processed upon receipt, including Plaintiff's FOIA Request, *id*. ¶¶ 5-27, and addresses the adequacy of the search for records responsive to Plaintiff's FOIA Request. *Id*. ¶¶ 29-32. According to Plaintiff, RIDS policy, which was followed in processing Plaintiff's FOIA Request, is to search for and identify "main" files responsive to most FOIPA requests at the administrative stage and, thus, RIDS also conducted a search of the CRS to locate any "reference" material potentially responsive to Plaintiff's FOIA Request. *Id*. ¶ 28. The CRS search was done using the index search methodology including the FBI's automated indices available through Sentinel. *Id*. ¶ 29. Such searches included

variations of Plaintiff's names resulting in the FBI identifying 22 references pertaining to Plaintiff. *Id*. ¶ 30. Because of its comprehensive nature and scope, CRS is the principal records system searched for records responsive to FOIA Requests concerning the FBI, and the Sentinel and ACS indices would also be most likely to locate any electronic surveillance records ("ELSUR") responsive to such request. *Id*. at 27, 31. These details provided by Hardy in his declaration, based on his personal knowledge and experience working as RIDS Section Chief when Plaintiff's FOIA Request was processed, *Carney*, 19 F.3d at 814 (FOIA response requires affidavit from agency employee responsible for FOIA requests), and which is both unrebutted and entitled to a presumption of good faith, *Wilner*, 592 F.3d 69 (properly made and unrebutted affidavit responding to FOIA request entitled to good faith presumption), sufficiently describe a reasonable and thorough search of all databases relevant to Plaintiff's FOIA request, *Grand Cent. P'Ship, Inc.*, 166 F.3d at 488-89 ("the law demands only a 'relatively detailed and nonconclusory' affidavit or declaration").

Further, as to Plaintiff's assertion that the FBI also should have searched other databases, including records of microphone surveillance ("MISUR"), physical surveillance ("FISUR"), laboratory records, and the FBI's "Bureau Mailing List" records system, Plaintiff's Memorandum at 5, the FBI is not required to search all records systems suggested by Plaintiff. Nor has Plaintiff provided any information on which the FBI could reasonably conclude additional records would likely be located outside the CRS. *See Hodge*, 703 F.3d at 580 (rejecting FOIA plaintiff's challenge to adequacy of agency's search for records responsive to FOIA request where Plaintiff failed to identify additional searches the requested agency should have conducted and offered no basis

for concluding additional documents might exist). Accordingly, the undisputed record establishes Plaintiffs performed a reasonable search for information, documents and records responsive to Plaintiff's FOIA request.

Summary judgment regarding the adequacy of the FBI's search in response to Plaintiff's FOIA Request is DENIED as to Plaintiff and GRANTED as to Defendant.

**D. FOIA Exemptions**

The balance of Plaintiff's arguments regarding the Records Releases are predicated on the so-called "FOIA Exemptions" set forth in 5 U.S.C. § 552(b) as the basis for redacting information from responsive documents or withholding their release altogether and "whether the agency has sustained its burden of demonstrating that the documents requested are ... exempt from disclosure." *Pub. Inv'rs Arbitration Bar Ass'n v. SEC*, 771 F.3d 1, 3 (D.C. Cir. 2014) (quoting *ACLU v. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011)). In particular, information responsive to Plaintiff's FOIA Request was withheld pursuant to 5 U.S.C. § 552(b)(3) ("Exemption 3), (6) (Exemption 6), and 7(C) ("Exemption 7(C)"), 7(D) ("Exemption 7(D)"), and 7(E) ("Exemption 7(E)"), and the court addresses the arguments raised with regard to each of these asserted exemptions.

**(1) Exemption 3**

The *Vaughn* Index lists one record withheld pursuant to Exemption 3, identified as Bates 51 ("Bates 51"), and part of the serial described as an "FBI Intelligence report provided by Buffalo Division dated February 17, 2012, summarizing Pickering, Jr. and other individuals as being involved in a local terrorist cell in Buffalo, NY." Dkt. 15-1 at 55. According to Hardy, "[t]he information withheld from disclosure pursuant to Exemption 3 consists of details reflecting the set up and installation of a pen register

and trap and trace device during a criminal investigation." Hardy Declaration ¶ 41. Hardy further describes the material redacted from Bates 51 as "the identities and phone numbers of the individuals subject to pen registers in this case, because [the FBI] is precluded from disclosing such information pursuant to 18 U.S.C. § 3123." *Id*.

As relevant here, Exemption 3 protects from disclosure information that is

> (3) specifically exempted from disclosure by statute . . . if that statute –
> (A)(i) requires that the matters by withheld from the public in such a manner as to leave no discretion on the issue; or
> (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.[20]

5 U.S.C. § 552(b)(3).

The Pen Register Act, 18 U.S.C. § 3123(d) specifically provides

> An order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that--
> (1) the order be sealed until otherwise ordered by the court; and
> (2) the person owning or leasing the line or other facility to which the pen register or a trap and trace device is attached or applied, or who is obligated by the order to provide assistance to the applicant, not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person, unless or until otherwise ordered by the court.

18 U.S.C.A. § 3123(d).

It is on this language Defendant relies in redacting from Bates 51 information pursuant to Exemption 3, asserting "[t]he information withheld from disclosure pursuant to Exemption 3 consists of details reflecting the set up and installation of a pen register and trap and trace device during a criminal investigation." Defendant's Memorandum at 12-13. Defendant continues that "[t]he information withheld from disclosure pursuant to

[20] Because the Pen Register Act was enacted prior to the enactment of the OPEN FOIA Act of 2009, 5 U.S.C. § 552(b)(3)(B) does not apply.

Exemption 3 consists of details reflecting the set up and installation of a pen register and trap and trace device during a criminal investigation." *Id*.

By its terms, the Pen Register Act provides for sealing a pen register order itself, but "not sealing of any and all information the order may contain even if appearing in other documents." *Labow v. U.S. Dep't of Just.*, 831 F.3d 523, 528 (D.C. Cir. 2016) ("*Labow II*") (citing 18 U.S.C. § 3132(d)(1)). "Although the statute additionally bars disclosures by certain private parties about the existence of a pen register order, in the absence of a court order allowing disclosure, . . . that limitation does not apply to the government." *Id*. (citing § 3123(d)(2)). As such, "Exemption 3 of FOIA, as regards the Pen Register Act, primarily authorizes the government to withhold a responsive pen register order itself, not all information that may be contained in or associated with a pen register order." *Id*.

Nevertheless, as used in the Pen Register Act, "the language 'unless otherwise ordered by the court' connotes two related principles," including providing the court with "discretion with respect to an order's unsealing," *Labow v. U.S. Dep't of Justice*, 278 F.Supp.3d 431, 440 (D.D.C. 2017) ("*Labow I*") (citing *Washington & G.R. Co. v. Tobriner,* 147 U.S. 571, 588-89 (1893); *Saunders v. Washington Metropolitan Area Transit Authority,* 505 F.2d 331, 333 (D.C.Cir. 1974) (examining the soundness of the district court's exercise of its discretion pursuant to an 'unless otherwise ordered by the court' provision); *Rector v. Mass. Bonding & Ins. Co.,* 191 F.2d 329, 333 (D.C.Cir. 1951) (noting the effect of a rule including the phrase "unless otherwise ordered by the court" vests discretion in the court.), and "FOIA litigation could, potentially, prompt the Court to exercise its discretion to unseal a given order. *Id*., 278 F.Supp.3d at 440-41.

Significantly, in *Labow II*, the explanation on which the defendant government agency relied in withholding information as exempted from disclosure based on the Pen Register Act was provided by Hardy, and is essentially the same language found in the Hardy Declaration in the instant case, including that "the information withheld from disclosure pursuant to Exemption 2 consists of details reflecting the set up and installation of a pen register and trap and trace device during a criminal investigation," and the withheld information includes "the identities and phone numbers of the individuals subject to pen registers in this case, because it is precluded from disclosing such information pursuant to 18 U.S.C. § 3123." Hardy Declaration ¶ 41. In *Labow II*, although the District Court found such description sufficiently justified withholding the information pursuant to Exemption 3, *Labow I*, 66 F.Supp.3d at 120, the D.C. Circuit Court of Appeals vacated the lower court's determination, explaining that

> [i]f the government withheld information contained exclusively in a pen register order, the information would necessarily fall under the Pen Register Act's nondisclosure requirements and thus would be shielded under Exemption 3 (assuming the pen register remains sealed). But if the government withheld information found in other responsive documents on the ground that a pen register order also contained the same information, the potential applicability of the Pen Register Statute (and hence of Exemption 3) would be far less clear. As it currently stands, we do not know whether this case involves the latter situation or, if so, whether there may be some justification for withholding the information beyond the mere fact that it also appears in a pen register.

*Labow II*, 831 F.3d at 529.

Significantly, upon remand to the District Court, the defendant government provided an updated declaration from Hardy permitting the court to discern whether a single sentence was properly withheld from disclosure because of how the sentence might relate to a pen register used in an FBI investigation six years earlier. *Labow v. U.S. Dep't of Justice*, 278 F.Supp.3d 431, 435 (D.D.C. 2017) ("*Labow III*"). The newly

submitted declaration permitted the District Court to determine that the withheld sentence was "[i]nformation at the crux of a pen register order that, as here, happens to appear in a document outside of the order itself and would necessarily compromise the order" and, thus, was "information that is protected by the [Pen Register] Act, and is properly withheld." *Id*. at 441-442.

In contrast, in the instant case, despite submitting the Seidel Declaration in further support of Defendant's summary judgment motion, the Seidel Declaration is silent as to the information withheld pursuant to Exemption 3, nor does Defendant provide any further declaration or information regarding the information withheld pursuant to Exemption 3. Further, although Bates 51 was also withheld as exempt pursuant to six other statutory FOIA exemptions, it is not possible to determine from the *Vaughn* Index whether the information for which FOIA Exemption 3 is asserted is exempt under another asserted FOIA Exemption, or whether such assertion is proper. Accordingly, Defendant must either, within 20 days, provide additional documentation permitting the court to determine whether FOIA Exemption 3 protects the release of information on Bates 51, or provide such information to Plaintiff. Summary judgment is thus DENIED insofar as Bates 51 was withheld pursuant to FOIA Exemption 3.

**(2) Exemptions 6 and 7(C)**

FOIA Exemptions 6 and 7(C) are the asserted reasons for numerous redactions. *Vaughn* Index, *passim*. Plaintiff maintains he seeks the names of FBI special agents involved in the investigation of Friends of the Ancient Forest, ARISSA, and the FBI's 2021-14 domestic terrorism investigation. Plaintiff's Memorandum at 6. Defendant maintains that in deciding to withhold information under FOIA Exemption 6, the relevant

privacy interests were properly identified and weighed against the public interests in disclosure so as to avoid "'a clearly unwarranted invasion of personal privacy.'" Defendant's Reply at 9 (quoting *Reed v. National Labor Relations Board*, 927 F.2d 1249, 1251 (D.C. Cir. 1991)). With regard to information withheld pursuant to FOIA Exemption 7(C), Defendant maintains disclosure of the information would serve no public interest, *id*. at 10, and the FBI properly demonstrated the withheld information was compiled for law enforcement purposes and readily meets the threshold requirement for Exemption 7, specifically, 5 U.S.C. § 552(b)(7). *Id.* at 10-11. *See* Discussion, *supra*, at 16-20.

FOIA Exemption 6 exempts from disclosure "personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). To determine whether identifying information may be withheld pursuant to Exemption 6, the court "must: (1) determine whether the identifying information is contained in 'personnel and medical files and similar files;' and (2) balance the public need for the information against the individual's privacy interest in order to assess whether disclosure would constitute a clearly unwarranted invasion of personal privacy." *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 291 (2d Cir. 2009) (citing and quoting *Wood v. F.B.I.,* 432 F.3d 78, 86 (2d Cir. 2005)). "The determination of whether Exemption 6 applies requires balancing an individual's right to privacy against the preservation of FOIA's basic purpose of opening agency action to the light of public scrutiny." *Id*. (citing *Dep't of the Air Force v. Rose,* 425 U.S. 352, 372 (1976) ("Exemption 6 does not protect against disclosure every incidental invasion of privacy—only such disclosures as constitute 'clearly unwarranted' invasions of personal

privacy.")). "'Only where a privacy interest is implicated does the public interest for which the information will serve become relevant and require a balancing of the competing interests.'" *Id*. (quoting *Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 509 (2d Cir. 1992)). To prevail over the public interest in disclosure, "[a]n invasion of more than a *de minimis* privacy interest protected by Exemption 6 must be shown to be 'clearly unwarranted.'" *Id*. "Under Exemption 6, therefore, the government's burden in establishing the required invasion of privacy is heavier than the burden in establishing invasion of privacy under Exemption 7(C)." *Id*. (quoting *U.S. Dep't of State v. Ray,* 502 U.S. 164, 172 (1991).

FOIA Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy. . . . 5 U.S.C. § 552(b)(7)(C). Exemption 7(C) may be invoked where no public interest would be served by disclosure of information that implicates privacy interests. *U.S. Dep't of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 775 (1989) ("*RCFP*") (denying disclosure of contents of FBI rap sheet to third party because the disclosure reasonably could be expected to constitute an invasion of personal privacy within the meaning of FOIA's law enforcement exemption). In particular, in *RCFP*, the court determined that although there may be "some public interest in providing interested citizens with answers to their questions" about the subject of the FOIA request, such as deciding whether to offer the subject employment, to rent him a house, or to extend him credit, "that interest falls outside the ambit of the public interest that the FOIA was enacted to

serve." *RCFP*, 489 U.S. at 775. "Thus whether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to 'the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny,' rather than on the particular purpose for which the document is being requested." *Id*. (quoting *Rose*, 425 U.S. at 372).

In the instant case, as stated, Discussion, *supra*, at 30-31, Plaintiff clarifies that he seeks the names of the FBI Special Agents involved in the investigations of Friends of the Ancient Forest, ARISSA, and the FBI's 2012-14 domestic terrorism investigation. Plaintiff's Memorandum at 6. According to Plaintiff, because local media outlets have featured stories about the FBI's investigation into Buckley, and Buckley plans to make any FBI records released available on social media, the privacy interests of the FBI Special Agents do not outweigh the significant public interest regarding how the FBI handled its investigations of Buckley. *Id*. at 7. In opposition, Defendant argues the privacy interests of the FBI Special Agents whose identity Plaintiff seeks outweigh any significant public interests regarding the FBI's handling of investigations of Plaintiff because (1) there is no evidence of ongoing public or media interest in Plaintiff's case with the most recent media article Plaintiff references dated 2016, (2) disclosure of the FBI Special Agents' names will not further the public's interest in how the FBI handled its investigation of Buckley because the progress of the investigation can be determined from the unredacted documents the FBI released to Buckley, and (3) disclosing the names of FBI Special Agency could lead to attempts to inflict violence or revenge on those involved in performing criminal investigations. Defendant's Reply at 12 (citing Seidel Declaration ¶ 8).

The Second Circuit Court of Appeals recognizes that government investigative personnel may be subject to harassment or embarrassment if their identities are disclosed. *Wood*, 432 F.3d at 78 (citing *Halpern v. FBI,* 181 F.3d 279, 297 (2d Cir.1999) (holding that FBI agents and other government employees have an interest against the disclosure of their identities to the extent that disclosure might subject them to embarrassment or harassment in their official duties or personal lives); and *Massey v. FBI,* 3 F.3d 620, 624 (2d Cir.1993) (same)). Accordingly, "[t]his interest against possible harassment and embarrassment of investigative personnel raises a measurable privacy concern that must be weighed against the public's interest in disclosure." *Id*. When determining the public's interest in disclosure of a government employee's identity, several factors must be considered "including the employee's rank and whether the information sought sheds light on government activity." *Id*. (citing *Perlman v. U.S. Dep't of Justice*, 312 F.3d 100, 107 (2d Cir. 2002) (applying a five-factor test where the government employee is the subject of an investigation), *vacated*, 541 U.S. 970 (2004), *reaffirmed*, 380 F.3d 110 (2d Cir. 2004)). Although in the instant case, the record does not reveal the rank of the employees whose identity Plaintiff seeks, such information is not likely to add to the public's understanding of how the FBI conducts its investigations especially given that the results of the investigation were disclosed to Plaintiff, albeit in redacted form. *See Vaughn* Index, Dkt. 15-1 at 55. *See Wood*, 432 F.3d at 88-89 (citing *U.S. Dep't of Veteran's Affairs,* 958 F.2d at 512 (disclosure of employee names is not related to informing the public about an agency's actions); *Hopkins v. U.S. Dep't of Housing and Urban Development,* 929 F.2d 81, 88 (2d Cir. 1991) (noting that disclosing

the names of individual employees would not illuminate how the Housing and Urban Development Agency enforced the Davis–Bacon Act)).

Initially, Plaintiff does not cite any case in support of his assertion that internal government investigations warrant additional scrutiny, and the Supreme Court has held that a presumption of legitimacy attends government actions that may not be overcome on the basis of unsupported allegations. *Wood*, 432 F.3d at 89 (citing *Ray,* 502 U.S. at 179; and *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 174 (2004) (citing *Ray* and holding, pursuant to Exemption 7(C), "the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred")). Here, Plaintiff references no evidence of government wrongdoing that the investigators were negligent or biased in the performance of their duties. Moreover, the names of the FBI Special Agents who investigated Plaintiff would not reveal anything about any asserted supposed bias, but such bias in the FBI's investigation would likely be reflected in the actions taken or not taken by the FBI or DOJ. Because the FBI has already revealed the substance of the investigation, knowledge of the names of the specific FBI Special Agents would add little, if anything, to the public's analysis of whether the FBI dealt with Plaintiff in an appropriate manner. Accordingly, the public's interest in the names of the FBI Special Agents involved in investigating Plaintiff is negligible and the investigators' interest in preventing the public disclosure of their identities, with the potential for resulting embarrassment and harassment, substantially outweighs disclosure of their identities. Consequently, such disclosure would be a "clearly unwarranted invasion of privacy," supporting the withholding of the information pursuant to Exemption 6 to FOIA.

Summary judgment with regard to Bates 51 information withheld pursuant to FOIA Exemptions 6 and 7(C) is DENIED as to Plaintiff and GRANTED as to Defendant.

**(3) Exemption 7(D)**

Information was redacted from several serials RIP or WIF pursuant to FOIA Exemption 7(D) which exempts from disclosure

> [R]ecords or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source . . . .

5 U.S.C. § 552(b)(7)(D).

According to Defendant, the information redacted pursuant to Exemption 7(D) includes information pertaining to confidential human sources ("CHS"), including "the name, identifying data, and information provided by individuals who assisted the FBI in the criminal investigation of Plaintiff with implied or express assurances of confidentiality, as well as the confidential source file number, and confidential source symbol number."[21] Defendant's Memorandum at 17 (citing Hardy Declaration ¶¶ 55-61). Defendant maintains that because such information provided by confidential sources concerns a criminal investigation conducted by the FBI, the second clause of Exemption 7(D) applies. *Id*. at 16 (citing *Ferguson v. F.B.I.*, 957 F.2d 1059, 1069 (2d Cir. 1992)). In

[21] Confidential "source file numbers" and "source symbol numbers" refer to administrative tools that facilitate the retrieval of information, responsive to a FOIA request, supplied by a confidential source while further obscuring such source's identity. Hardy Declaration ¶¶ 55, 57-61. Each confidential source file is unique to a particular confidential source and is used only in documentation relating to that confidential source. *Id*. ¶ 57. When a confidential source reports information to the FBI on a regular basis pursuant to an express assurance of confidentiality, such source is considered a CHS to whom the FBI assigns a permanent source symbol number which the FBI then uses when referring to the CHS to obscure the CHS's identity. *Id*. ¶ 60.

opposition, Plaintiff argues that any redactions of the names of Upham and Lloyd, and any information provided by such sources is unwarranted because their CHS work for the FBI was revealed in a public media article and Upham cooperated with one Adam Federman ("Federman"), a freelance journalist who wrote an article that was published in *The Buffalo News*, and that such cooperation essentially waived any assurances of confidentiality Upham and Lloyd received from the FBI for assisting with the FBI's investigation targeting Plaintiff, Pickering, and Burning Books. Plaintiff's Memorandum at 7-8. Plaintiff further maintains that insofar as the FBI asserts the release of a confidential source symbol number could impede the FBI's ability to recruit and maintain CHSs, the FBI's need to maintain the confidentiality of such confidential source symbol numbers to maintain ensure the continued cooperation of confidential sources has been rejected by courts. *Id*. at 8 (citing cases). In reply, Defendant argues that insofar as Plaintiff seeks records about third-party individuals he claims were federal witnesses and informants without proof the individuals were ever confirmed by the FBI to be such informants, *i.e.*, Upham and Lloyd, "the FBI relies on a long standing policy to neither confirm nor deny the existence of such records (a Glomar response) pursuant to FOIA exemption 7(D)." Defendant's Reply at 14-15.

"The *Glomar* doctrine originated in a FOIA case concerning records pertaining to the Hughes Glomar Explorer, an oceanic research vessel." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 67 (2d Cir. 2009) (citing *Phillippi v. CIA,* 546 F.2d 1009 (D.C.Cir.1976)). In *Phillippi,* the Central Intelligence Agency ("CIA"), believing that the "existence or nonexistence of the requested records was itself a classified fact exempt from disclosure under ... FOIA," responded to a FOIA request that "in the interest of national

security, involvement by the U.S. government in the activities which are the subject matter of [plaintiff's] request can neither be confirmed nor denied." *Phillipi*, 546 F.2d at 1012. The principle "that an agency may, pursuant to FOIA's statutory exemptions, refuse to confirm or deny the existence of certain records in response to a FOIA request - has since become known as the *Glomar* doctrine." *Wilner*, 592 F.3d at 67. In the instant case, Defendant's response that it can neither confirm nor deny whether records exist pertaining to Upshaw or Lloyd was a proper *Glomar* response.[22]

In particular, the Second Circuit has held "as a general rule, (1) an agency may provide a *Glomar* response to FOIA requests for information gathered under a program whose existence has been publicly revealed, and may do so specifically with respect to information gathered under the [Terrorist Surveillance Program], and (2) that such a response will be reviewed in the same manner as any other *Glomar* response to a FOIA request." *Wilner*, 592 F.3d at 69. The so-called "*Glomar* doctrine" applies "in cases in which the existence or nonexistence of a record is a fact exempt from disclosure under a FOIA exception." *Id*. 592 F.3d at 70. If, however, the existence or nonexistence of the specific records sought by the FOIA request has been the subject of an official public acknowledgment, *i.e.*, the government has admitted that a specific record exists, then the government agency is precluded from later making a *Glomar* response regarding whether that same record exists or not. *Id*. (citing *Wolf v. CIA,* 473 F.3d 370, 378–79 (D.C. Cir. 2007), and *Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy,*

[22] Although Defendant first asserts the *Glomar* doctrine as the basis for withholding information in its reply in further support of summary judgment, Defendant did not waive such argument by failing to raise it earlier because Plaintiff first specified he is seeking any information regarding Upham and Lloyd in arguing in support of Plaintiff's Motion for summary judgment, not in the FOIA Request, such that Defendant raises *Glomar* in opposition to summary judgment.

891 F.2d 414, 421 (2d Cir. 1989)). Further, "to invoke the *Glomar* response to a FOIA request, an agency must 'tether' its refusal to one of the nine FOIA exemptions." *Id.*, 592 F.3d at 71. "In other words, 'a government agency may ... refuse to confirm or deny the existence of certain records ... if the FOIA exemption would itself preclude the acknowledgment of such documents.'" *Id*. (quoting *Minier v. Central Intelligence Agency,* 88 F.3d 796, 800 (9th Cir. 1996)). To "tether its refusal to one of the nine FOIA exemptions" *New York Times v. Cent. Intel. Agenc*y, 965 F.3d 109, 114 (2d Cir. 2020) (quoting *Wilner*, 592 F.3d at 71), the agency can submit affidavits or declarations providing sufficient detail as to why an exemption is applicable. *Id*.

Here, Hardy explains that the FBI protected from disclosure under FOIA Exemption 7(D) identifying data and information provided by individuals who assisted in a domestic terrorism investigation and provided information on other matters under "express" assurances of confidentiality, and that the so-called CHSs were provided by the FBI expressed assurances of confidentiality with their identities thereafter referenced only by a confidential source file number or symbol number. Hardy Declaration ¶ 55. Seidel further explains that either confirming or denying the existence of any records responsive to Plaintiff's FOIA Request seeking records of third-party individuals, specifically Upham and Lloyd, would jeopardize the FBI's confidential sources by revealing which individuals are informants thereby dissuading current and future potential sources from providing or continuing to provide critical, law enforcement relevant information to the FBI. Seidel Declaration ¶ 9. This information sufficiently tethers the withholding of the names of third-party informants, including Upshaw and Lloyd, to Exemption 7(D).

Both Hardy and Seidel also explain that requiring the FBI to reveal confidential source symbol numbers assigned to CHSs who report information to the FBI on a regular basis pursuant to express assurances of confidentiality would jeopardize these informant's cooperation with the FBI by providing criminals with the means to identify them in additional records, potentially resulting in harassment or retaliation against them by individual investigative subjects for whom they provided information. Hardy Declaration ¶¶ 57-61; Seidel Declaration ¶ 10. Significantly, "[a] source should be deemed confidential if the source furnished information with the understanding that the FBI would not divulge the communication except to the extent the Bureau thought necessary for law enforcement purposes." *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 174 (1993). Nor is disclosure required "if the source provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *Halpern*, 181 F.3d at 298 (quoting *Landano*, 508 U.S. at 172) (quotations omitted). Moreover, with regard to Plaintiff's reliance on *Memphis Publishing Co. v. FBI*, 879 F.Supp.2d 1, 14 (D.D.C. 2012) for the proposition that there is no basis for withholding a confidential source symbol number when the identity of the CHS to whom the number pertains has been revealed, Plaintiff's Memorandum at 8-9, the case is inapposite because in contrast to *Memphis Publishing Co*., in the instant case, neither Upshaw nor Lloyd have been definitively revealed as a CHS. Because the confidential source symbol numbers at issue here were created by the FBI during the course of a criminal investigation, such information relates to the identity of the confidential sources as well as to any information provided by the sources and is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(D).

Accordingly, summary judgment on the information withheld pursuant to FOIA Exemption 7(D) should be DENIED as to Plaintiff and GRANTED as to Defendant.

**(4) Exemption 7(E)**

Information in several serials was redacted and withheld from disclosure pursuant to FOIA Exemption 7(E) which exempts

> [R]ecords or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law . . . .

5 U.S.C. § 552(b)(7)(E).

Defendant relies on the averments by Hardy that "[t]his exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it thereby protects techniques and procedures that are not well-known to the public, and protects non-public details about the use of well-known techniques and procedures." Hardy Declaration ¶ 63. Hardy particularly describes the information withheld as "FBI protected investigative techniques and procedures, sensitive file numbers or subfile numbers, information regarding targets, dates, and scope of surveillance, database identifiers, types of investigations, collection and analysis of information, non-public source reporting documents, identity of FBI squads, units, and divisions, operational directives, targets of pen registers, and tactical information contained in operational plans." Defendant's Memorandum at 18 (citing Hardy Declaration ¶¶ 65-75). In opposition, Plaintiff maintains the FBI invokes Exemption 7(E) to redact its use of database search results located through non-public databases, and investigative techniques that are generally known to the public and, thus, are not exempted from

disclosure pursuant to Exemption 7(E). Plaintiff's Memorandum at 9-10. In reply, Defendant denies Plaintiff's challenges to four specific categories of information withheld pursuant to Exemption 7(D) including (1) database search results obtained through non-public databases; (2) the targets of pen register/trap and trace devices; (3) information about techniques and procedures the FBI uses in conducting domestic terrorism investigations; and (4) the names of FBI units, squads, and divisions reflect knowledge well-known to the public. Defendant's Reply at 15-19.

"Exemption (b)(7)(E) covers investigatory records that disclose investigative techniques and procedures not generally known to the public." *Doherty*, 775 F.2d at 52 & n. 4. "The Second Circuit has explained that, as used in Exemption 7(E), a 'technique' is 'a technical method of accomplishing a desired aim' and a 'procedure' is 'a particular way of doing something or going about the accomplishment of something.'" *American Civil Liberties Union Foundation v. Dep't of Homeland Security*, 243 F.Supp.3d 393, 402 (S.D.N.Y. 2017) (quoting *Allard K. Lowenstein Intern. Human Rights Project v. Dep't of Homeland Security*, 626 F.3d 678, 681 (2d Cir. 2010)). "Accordingly, to invoke Exemption 7(E) here, the agency must justify its assertion that its practice . . . at issue in this motion actually shows a 'technique' or 'procedure' and that it is not already known to the public." *Id*. Nevertheless, "[w]hile the government retains the burden of persuasion that the information is not subject to disclosure under FOIA, 'a party who asserts that the material is publicly available carries the burden of production on that issue.'" *Inner City Press/Community on the Move v. Board of Governors of the Federal Reserve System*, 463 F.3d 239, 245 (2d Cir. 2006) (quoting *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279 (D.C.Cir. 1992)). Somewhere

within either the *Vaughn* Index or the government's affidavit, Defendant must provide, "a sufficiently specific link" between disclosing the particular withheld information and revealing how, and to what extent, the Defendant relies on such information in its investigations. *Island Film, S.A. v. Dep't of the Treasury*, 869 F.Supp.2d 123, 138 (D.D.C. 212). "Moreover, 'it is well-established that 'an agency does not have to release all details concerning law enforcement techniques just because some aspects of them are known to the public.'" *Kuzma v. U.S. Dep't of Justice*, 2016 WL 9446868, at *12 (W.D.NY. Apr. 18, 2016) (quoting *Bishop v. U.S. Dep't of Homeland Security*, 45 F.Supp.3d 380, 391 (S.D.N.Y. 2014)).

In the instant case, Plaintiff has not produced any evidence the FBI's cited procedures and techniques used in investigating Plaintiff for domestic terrorism are publicly available. In contrast, Hardy explains although it is public knowledge that the FBI compiles and analyzes information, that specific methods and procedures the FBI uses to collect and analyze the information are not publicly known. *See* Hardy Declaration ¶¶ 63,64. Hardy further provides the requisite "specific link" between the withheld materials and the extent to which the FBI relies on such information in conducting its investigations. *Island Film, S.A.*, 869 F.Supp.2d at 138. Hardy specifically avers that revealing the techniques and procedures commonly used in sensitive FBI investigations, and the details and circumstances under which they are used, would enable targets of such techniques to avoid detection or develop countermeasures to circumvent the effective use of the techniques. *Id*. ¶ 65. Releasing file names and numbers can identify the investigative interest and priority given to such matters by the FBI, as well as what types of investigative strategies the FBI uses in

countering or investigating certain types of criminal behavior, and permit the targets to change their pattern of activity to avoid detection, apprehension, or create alibis for suspected activities. *Id*. ¶ 66. Revealing the targets, dates, and scope of surveillances would also provide criminals with an understanding of when they should expect the FBI to conduct surveillance. *Id*. ¶ 67. Identifying FBI protected, non-public database names and search results that serve as repositories for counterterrorism and investigative data for the FBI personnel, and task force members from local, state and other federal agencies would enable criminals to employ countermeasures to avoid detection. *Id*. ¶ 68. Information withheld which, when referenced in connection with an actual investigation rather than in general discussion would reveal what activities trigger a full, as opposed to preliminary, investigation. *Id*. ¶ 69. Releasing the methodologies to collect and analyze information would reveal now and from whether such information is collected. *Id*. ¶ 70. Releasing source reporting documents in multiple locations would reveal the true extent of information provided by individual confidential sources. *Id*. ¶ 71. The identity of FBI units, squads, and divisions involved in investigating domestic terrorism would reveal the level of focus applied by the FBI to certain areas of assigned enforcement activity, and provide insight into how the FBI applies its resources. *Id*. ¶ 72. Revealing the FBI's operational directives would provide individuals and entities with insight into the FBI's standards when investigating domestic terrorism. *Id*. ¶ 73. Releasing the names of the targets of pen registers and trap and trace devices would disclose why and when the FBI decides to use such investigative devices. *Id*. ¶ 74. Finally, tactical information and the operation plans containing such information is an internal tool used by the FBI to coordinate with law enforcement agencies regarding

contemplated actions, potential techniques to be used, and personnel needed to execute the operational plans. *Id*. ¶ 75. Significantly, all such revelations would facilitate criminals in their attempts to avoid disruption of their criminal activity and detection by FBI surveillance and develop countermeasures rendering use of the techniques less effective. *Id*. ¶¶ 65-75. Further, Plaintiff has not established that any of the requested information is publicly available as is Plaintiff's burden. *Inner City Press*, 463 F.3d at 245. Accordingly, the court finds the FBI properly withheld information pursuant to Exemption 7(E).

Summary judgment regarding information withheld pursuant to Exemption 7(E) is DENIED as to Plaintiff, and GRANTED as to Defendant.

## CONCLUSION

Based on the foregoing, Defendant's Motion (Dkt. 13) is GRANTED in part and DENIED in part; Plaintiff's Motion (Dkt. 19) is GRANTED in part and DENIED in part. Defendant must either, within 20 days, provide additional documentation permitting the court to determine whether FOIA Exemption 3 protects the release of information on Bates 51, or provide such information to Plaintiff.

SO ORDERED.

/s/ *Leslie G. Foschio*

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED: November 18th, 2021
Buffalo, New York